MICHAEL FEUER (SBN 111529)
CITY ATTORNEY
JAMES P. CLARK (SBN 64780)
CHIEF DEPUTY CITY ATTORNEY
CITY OF LOS ANGELES
200 N. Main Street, Room 800
Los Angeles, CA 90012
Telephone: (213) 978-8100
Email: Mike.feuer@lacity.org
Email: James.p.clark@lacity.org

STEVE W. BERMAN (*pro hac vice* pending)
HAGENS BERMAN SOBOL SHAPIRO LLP
1918 8th Avenue, Suite 3300
Seattle, WA 98101
Telephone: (206) 623-7292
Email: steve@hbsslaw.com

ELAINE T. BYSZEWSKI (SBN 222304)
LEE M. GORDON (SBN 174168)
HAGENS BERMAN SOBOL SHAPIRO LLP
301 North Lake Avenue, Suite 203
Pasadena, CA 91101
Telephone: (213) 330-7150
Email: elaine@hbsslaw.com
Email: lee@hbsslaw.com

[Additional Counsel Listed on Signature Page]

*Attorneys for Plaintiff the City of Los Angeles*

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CITY OF LOS ANGELES, a municipal corporation,<br><br>Plaintiff,<br><br>v.<br><br>JPMORGAN CHASE & CO.; JPMORGAN CHASE BANK, N.A.; and CHASE MANHATTAN BANK USA, N.A.,<br><br>Defendants. | No.  14-4168<br><br>**COMPLAINT FOR VIOLATION OF THE FEDERAL FAIR HOUSING ACT**<br><br>DEMAND FOR JURY TRIAL |

# TABLE OF CONTENTS

**Page**

I.    NATURE OF THE ACTION .................................................................. 1

    A.    JPMorgan Has Engaged in a Continuing Pattern of Discriminatory Mortgage Lending Practices in Los Angeles Resulting in Foreclosures ......................................... 1

II.   PARTIES ............................................................................................ 11

III.  JURISDICTION AND VENUE ........................................................... 14

IV.   FACTUAL BACKGROUND .............................................................. 15

    A.    Background Regarding Discriminatory Loan Practices, Reverse Redlining, and Redlining ...................................... 15

V.    JPMORGAN ENGAGED IN DISCRIMINATORY LENDING PRACTICES ....................................................................................... 18

    A.    JPMorgan's Conduct Had a Disparate Impact on Minority Borrowers in Violation of the Fair Housing Act ...................... 18

        1.    Discriminatory lending results in a disproportionate number of foreclosures in minority areas. ................... 18

        2.    Minority neighborhoods are disproportionate recipients of predatory loans. ..................................... 20

    B.    JPMorgan Intentionally Discriminated Against Minority Borrowers in Violation of the Fair Housing Act, as Demonstrated by Former Bank Employees ......................... 25

        1.    JPMorgan targets minorities for predatory loan terms (and pays its employees more for doing so). ............... 26

        2.    JPMorgan underwrites adjustable rate loans that borrowers cannot afford. ............................................ 27

        3.    JPMorgan tends to require prepayment penalties more from minority borrowers. ..................................... 28

        4.    JPMorgan induced foreclosures by failing to offer refinancing or loan modifications to minority customers on fair terms, and otherwise limiting equal access to fair credit. .............................................. 28

        5.    JPMorgan engages in other abusive lending practices. ................................................................. 31

    C.    Minorities in Fact Receive Predatory Loan Terms from

JPMorgan ................................................................................ 32

D.  Minorities in Los Angeles Receive Such Predatory Loan
Terms from JPMorgan Regardless of Creditworthiness ................... 33

E.  JPMorgan's Targeting of Minorities who in Fact Receive
Predatory Loan Terms Regardless of Creditworthiness
Causes Foreclosures ................................................................... 36

1.  Data shows that JPMorgan's foreclosures are
disproportionately located in minority
neighborhoods in Los Angeles. ....................................... 36

2.  Data shows that JPMorgan's loans to minorities
result in especially quick foreclosures. ............................. 38

3.  Data shows that the discriminatory loan terms cause
the foreclosures. .......................................................... 39

VI.  INJURY TO LOS ANGELES CAUSED BY JPMORGAN'S
DISCRIMINATORY LOAN PRACTICES ........................................... 42

A.  Los Angeles has been Injured by a Reduction in Property
Tax Revenues from Foreclosures Caused by
Discriminatory Loans Issued by JPMorgan ................................. 42

1.  The decreased value of the properties foreclosed by
JPMorgan result in reduced property tax revenues. ................. 43

2.  The decreased value of properties in the
neighborhoods surrounding foreclosed properties
results in reduced property tax revenues. ........................... 43

B.  Los Angeles Is Injured Because It Still Must Provide
Costly Municipal Services for Properties in Minority
Neighborhoods that Have Become Vacant as a Direct
Result of Discriminatory Loans Originated or Purchased
by JPMorgan ............................................................................. 46

VII.  SAMPLE FORECLOSURE PROPERTIES IN THE CITY OF
LOS ANGELES ........................................................................... 47

VIII.  STATUTE OF LIMITATIONS AND CONTINUING
VIOLATIONS DOCTRINE ............................................................. 48

IX.  CLAIMS FOR RELIEF .................................................................. 48

FIRST CLAIM FOR RELIEF  (Violation of the Federal Fair Housing
Act, 42 U.S.C. §§ 3601, et seq.) ................................................. 48

SECOND CLAIM FOR RELIEF  (Common Law Claim For
Restitution Based On California Law) ........................................... 51

# I.  NATURE OF THE ACTION

1. It is axiomatic that banks should not make discriminatory loans.  Banks must extend credit to minorities on equal terms as they do to other similarly situated borrowers.  Banks should not target minority neighborhoods for loans that discriminate nor make loans to minorities on terms that are worse than those offered to whites with similar credit characteristics.  When banks engage in such discriminatory conduct, the misconduct has profound financial consequences for the cities in which mortgaged properties exist, and banks should be responsible for those financial consequences.  Banks should reimburse the City for lost tax revenues due to discriminatory lending.  And banks should pay the costs of repairing and maintaining properties that go into foreclosure due to discriminatory lending.  This lawsuit arises because JPMorgan breached these legally mandated obligations and foreseeably injured the City of Los Angeles.

## A.  JPMorgan Has Engaged in a Continuing Pattern of Discriminatory Mortgage Lending Practices in Los Angeles Resulting in Foreclosures

2. This suit is brought pursuant to the Fair Housing Act of 1968 ("FHA"), as amended, 42 U.S.C. §§ 3601, *et seq.*, by the City of Los Angeles ("Los Angeles" or "City") to seek redress for injuries caused by JPMorgan's[1] ("JPMorgan" or "the Bank") pattern or practice of illegal and discriminatory mortgage lending.  Specifically, Los Angeles seeks injunctive relief and damages for the injuries caused by foreclosures on JPMorgan's loans in minority neighborhoods and to minority

---

[1] Defendants collectively are referred to as "JPMorgan," including:  JPMorgan Chase & Co., JPMorgan Chase Bank, N.A., JPMorgan Chase, and Chase Manhattan Bank USA, N.A.  JPMorgan Chase & Co. is the result of the combination of several large U.S. banking companies over the last decade including JPMorgan Manhattan Bank, J.P. Morgan & Co., Bank One, Bear Stearns and Washington Mutual.  Accordingly, Plaintiff alleges that Defendants are also liable for residential home loans and lending operations acquired from, and/or sold by or through, Washington Mutual Bank, Washington Mutual Bank F.A., Bear Stearns Residential Mortgage, Chase Manhattan Mortgage Corporation, Encore Credit Corporation, Long Beach Mortgage Company, Performance Credit Corporation, JPE Home Finance LLC, and Bravo Credit Corp.

borrowers that are the result of JPMorgan's unlawful and discriminatory lending practices.  The unlawful conduct alleged herein consists of both intentional discrimination and disparate impact discrimination.

3.     JPMorgan has engaged in a continuous pattern and practice of mortgage discrimination in Los Angeles since at least 2004 by imposing different terms or conditions on a discriminatory and legally prohibited basis.  In order to maximize profits at the expense of the City of Los Angeles and minority borrowers, JPMorgan adapted its unlawful discrimination to changing market conditions. This unlawful pattern and practice is continuing through the present and has not terminated. Therefore, the operative statute of limitations governing actions brought pursuant to the Federal Fair Housing Act has not commenced to run.

4.     The pattern and practice of lending discrimination engaged in by JPMorgan consists of traditional redlining[2] and reverse redlining,[3] both of which have been deemed to violate the FHA by federal courts throughout the country.  JPMorgan engaged in redlining, and continues to engage in said conduct, by refusing to extend mortgage credit to minority borrowers in Los Angeles on equal terms as offered to non-minority borrowers.  JPMorgan engaged in reverse redlining, and continues to engage in said conduct, by extending mortgage credit on predatory terms to minority borrowers in minority neighborhoods in Los Angeles on the basis of the race or ethnicity of its residents.  Federal Reserve Chairman Ben Bernanke recently acknowledged these twin evils of mortgage discrimination and explained that both

---

[2] Redlining is the practice of denying credit to particular neighborhoods based on race.

[3] Reverse redlining is the practice of flooding a minority community with exploitative loan products.

COMPLAINT FOR VIOLATION OF
THE FEDERAL FAIR HOUSING ACT                    - 2 -
010346-11  691167 V1

types of mortgage discrimination "continue to have particular significance to mortgage markets."[4]

5.     Major banks such as JPMorgan have a long history of engaging in redlining throughout Los Angeles.  That practice began to change in the late 1990s, when JPMorgan adapted to changing market conditions and began to flood historically underserved minority communities with mortgage loans that consisted of a variety of high cost and abusive mortgage loan products with predatory terms as compared to the mortgage loans issued to white borrowers (reverse redlining).

6.     JPMorgan's discriminatory lending practices have the purpose and effect of placing vulnerable, underserved borrowers in loans they cannot afford.  Reverse redlining maximizes JPMorgan's profit without regard to the borrower's best interest, the borrower's ability to repay, or the financial health of underserved minority neighborhoods.  Moreover, JPMorgan has averted any significant risk to itself by selling the vast majority of mortgage loans it originates or purchases on the secondary market (collectively "JPMorgan Loans").

7.     Between 1996-2006, one category of discriminatory loan products – subprime loans – grew throughout the country from $97 billion to $640 billion.  These loans were frequently targeted to minorities.  Upon information and belief, the lack of accessible credit resulting from JPMorgan's previous pattern and practice of redlining in the minority communities in Los Angeles created conditions whereby the Bank could easily target and exploit the underserved minority communities who due to traditional redlining had been denied credit.

8.     Thereafter, following several years of issuing abusive, subprime mortgage loans throughout the minority communities of Los Angeles, commencing in or around 2007, JPMorgan once again adapted to changing market conditions while

---

[4] Remarks by Federal Reserve Chairman Ben Bernanke at the Operation HOPE Global Financial Dignity Summit, Atlanta, Georgia at pg. 10 (November 15, 2012) *available at* www.federalreserve.gov/newsevents/speech/bernanke20121115a.htm.

continuing its pattern and practice of issuing a variety of discriminatory loan products. Simultaneously, JPMorgan also decided to curtail the issuance of mortgage credit to minority borrowers in Los Angeles.[5]  In other words, JPMorgan not only refused to extend credit to minority borrowers when compared to white borrowers, but when the Bank did extend credit, it did so on predatory terms.  This combination of reverse redlining and redlining represents a continuing and unbroken pattern and practice of mortgage lending discrimination in Los Angeles that still exists today.

9.     JPMorgan's pattern and practice of *reverse redlining* has caused an excessive and disproportionately high number of foreclosures on the JPMorgan Loans it has made in the minority neighborhoods of Los Angeles.  Foreclosures on loans originated by JPMorgan are concentrated in these neighborhoods even though the bulk of JPMorgan's lending in Los Angeles is in white neighborhoods.  *A loan in a predominantly minority neighborhood is 2.190 times more likely to result in foreclosure than is a loan in a predominantly white neighborhood.*

10.    JPMorgan's pattern and practice of *traditional redlining* has also caused an excessive and disproportionately high number of foreclosures in the minority neighborhoods of Los Angeles.  These foreclosures often occur when a minority borrower who previously received a predatory loan sought to refinance the loan, only to discover that JPMorgan refused to extend credit at all, or on equal terms as when refinancing similar loans issued to white borrowers.  The inevitable result of the combination of issuing a predatory loan, and then refusing to refinance the loan, was foreclosure.

11.    JPMorgan would have had comparable foreclosure rates in minority and white communities if it had properly and uniformly applied responsible underwriting practices in both areas.  JPMorgan possesses sophisticated underwriting technology

---

[5] California Reinvestment Coalition, *From Foreclosure to Re-Redlining* (2010), at 4 (*available at* http://www.community-wealth.org/sites/clone.community-wealth.org/files/downloads/report-stein-gwynn.pdf).

and data that allows it to predict with precision the likelihood of delinquency, default, or foreclosure.  The fact that JPMorgan's foreclosures are so disproportionately concentrated in minority neighborhoods is not the product of random events.  To the contrary, it reflects and is fully consistent with JPMorgan's practice of targeting minority neighborhoods and customers for discriminatory practices and predatory pricing and products.  It also reflects and is consistent with JPMorgan's practice of failing to underwrite minority borrowers' applications properly, and of putting these borrowers into loans which (1) have more onerous terms than loans given to similarly situated white borrowers, and (2) the borrowers cannot afford, leading to foreclosures.

12. The Bank's discriminatory lending practices are evidenced by information from confidential witness statements provided by former employees of JPMorgan (discussed further herein).  For example:

a) "If you wanted to target the Hispanic community you had to have certain words in there that you'd want to use to attract [the borrowers]." Certain mortgage loan products, like negative amortization loans, were "tailored for minorities, but it was not specifically just for them . . . It was easy to throw them into that [negative amortization] program and get them approved for that program at the one percent rate." Loan officers did not always explain the repercussions: "That's where a lot of clients were misled. They thought it was a 1 percent fixed [rate]." "The [initial monthly] cost was bare minimum. But the possibilities were there that it could turn out to be the worst case [scenario] for the borrowers, and that's exactly what happened."

b) "The loans just weren't going through in that [minority neighborhood]. It wasn't worth it [to the Bank] to have someone there."

c) "The purpose of the [HAMP] program was to get people out of these bad loans, and the banks refused to do it.  To find out "how they are discriminating, look at the position of the branches.  That's going to show you." JPMorgan is opening "huge numbers" of branches across California, "but none of this is happening in minority neighborhoods. That, in itself, is the biggest indication of discrimination that you can find." "The redlining and stuff like that, that still goes on."

d)    "The people who didn't understand English and stuff like that" tended to face higher interest rates. "There were a lot of things with which I didn't agree" at the Bank. "A lot of times there was no mercy," pushing borrowers into foreclosure while loan modifications were pending.

13.    The reports of these witnesses are confirmed when Los Angeles data on JPMorgan loans is examined. Such an examination reveals a widespread practice of discrimination. For example, a regression analysis that controls for credit history and other factors demonstrates that an African-American JPMorgan borrower was 1.795 times more likely to receive a predatory loan than a white borrower, and a Latino borrower 1.576 times more likely. The regression analysis confirms that African-Americans with FICO scores over 660 are 2.026 times more likely to receive a predatory JPMorgan loan than a white borrower, and a Latino borrower 1.796 times more likely.

14.    The Office of the Comptroller of the Currency and the Board of Governors of the Federal Reserve System brought an action alleging that certain large banks, including JPMorgan, engaged in mortgage lending related misconduct that induced a national foreclosure crisis. In connection with that action, JPMorgan entered into a settlement agreement with the government pursuant to which JPMorgan will: (a) make a cash payment of $753 million into a settlement fund for distribution to qualified borrowers; and (b) provide an additional $1.2 billion to foreclosure prevention actions.

15.    In 2012, JPMorgan Chase and four other large mortgage servicers agreed to a global settlement with the U.S. Department of Justice, the U.S. Department of Housing and Urban Development, the Consumer Financial Protection Bureau, and the state attorneys general. The settlement relates to unethical mortgage origination and servicing activities similar to the activities alleged herein. Under the settlement, JPMorgan will make cash payments of approximately $1.1 billion to 50 states (with a

1    set aside to certain borrowers); offer approximately $500 million of refinancing to

2    certain borrowers; and provide approximately $3.7 billion of additional payments for

3    certain borrowers.

4         16.    The past several years have been highly profitable for JPMorgan.

5    According to recent press releases, the Bank generated a record amount of (i) net

6    income ($19.9 billion) and (ii) diluted earnings per share ($5.22). The following charts

7    illustrate these results.

8

9              Net Income (millions)

10



COMPLAINT FOR VIOLATION OF
THE FEDERAL FAIR HOUSING ACT
010346-11  691167 V1

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Earnings per share



17.     At the same time that JPMorgan achieved record financial success, the Bank's discriminatory practices and resulting foreclosures in the City's minority neighborhoods have inflicted significant, direct, and continuing financial harm to the City.  Since 2008, banks have foreclosed on approximately 1.7 million homes in California, and JPMorgan is responsible for a significant number of these foreclosures.

18.     In addition to reverse redlining, JPMorgan has induced foreclosures since 2009 by failing to extend branch support to minority neighborhoods, pulling existing Bank support from minority neighborhoods, declining to offer refinancings or loan modifications to minority customers on fair terms, and otherwise denying minority borrowers equal access to fair credit.

19.     One report[6] has estimated the impact that the City of Los Angeles has suffered due to discriminatory lending practices by all lenders as follows:

_____

[6] Alliance of Californians for Community Empowerment and the California Reinvestment Coalition, *The Wall Street Wrecking Ball:  What Foreclosures are Costing Los Angeles Neighborhoods* (September 2011).

- Overall, Los Angeles homeowners are estimated to have lost $78.8 billion in home values as a direct result of the 200,000 foreclosures for 2008-2012 alone.

- Property tax revenue losses are estimated to be $481 million in the wake of the foreclosure crisis.

- The typical foreclosure costs local governments more than $19,000 for increased costs of safety inspections, police and fire calls, trash removal, and property maintenance.  In Los Angeles, these costs are estimated to be $1.2 billion.

- Los Angeles has 79,029 homeowners underwater totaling $7.3 billion in loan value.  If banks wrote down those mortgages, it could pump $780 million into the local economy and create 11,353 jobs.

20.     In this action the City seeks damages for reduced property tax revenues based on (a) the decreased value of the foreclosed properties themselves, and (b) the decreased value of properties surrounding the foreclosed properties.  In addition, the City seeks damages based on the expenditure of municipal services that will be required to remedy the blight and unsafe and dangerous conditions which exist at vacant properties that were foreclosed as a result of JPMorgan's illegal lending practices.

21.     Because of the multitude of analytic tools available to JPMorgan to determine the likelihood that a particular mortgage loan would result in default by the borrower, as well as the existence of various studies, reports, and other pertinent literature specifically addressing the connection between mortgage loans and foreclosures, it was foreseeable that JPMorgan knew, or should have known, that a predatory or high risk loan issued to an African-American or Hispanic in certain neighborhoods in Los Angeles would result in default and subsequent foreclosure.  Moreover, because JPMorgan maintains numerous branch offices throughout Los

Angeles, and has knowledge of the specific address for each loan it issued, it was foreseeable that JPMorgan knew, or should have known, of the condition of foreclosed properties corresponding to loans that it issued in Los Angeles regardless of whether it serviced the loan or subsequently sold the servicing rights to a third party.

22.   According to Federal Reserve Chairman Bernanke, "foreclosures can inflict economic damage beyond the personal suffering and dislocation that accompany them.  Foreclosed properties that sit vacant for months (or years) often deteriorate from neglect, adversely affecting not only the value of the individual property but the values of nearby homes as well.  Concentrations of foreclosures have been shown to do serious damage to neighborhoods and communities, reducing tax bases and leading to increased vandalism and crime.  Thus, the overall effect of the foreclosure wave, especially when concentrated in lower-income and minority areas, is broader than its effects on individual homeowners."[7]

23.   The discriminatory lending practices at issue herein have resulted in what many leading commentators describe as the "greatest loss of wealth for people of color in modern US history."  It is well-established that poverty and unemployment rates for minorities exceed those of whites, and therefore, home equity represents a disproportionately high percentage of the overall wealth for minorities.[8]  Indeed, between 2005-2009, the median wealth of Latino households decreased by 66 percent, and the median wealth of African-American households decreased by 53 percent, while the median wealth of white households decreased just 16 percent.[9]  As Federal Reserve Chairman Bernanke recently explained, as a result of the housing crisis,

---

[7] Bernanke, *supra* n.4 at pg. 4.

[8] Robert Schwemm and Jeffrey Taren, *Discretionary Pricing, Mortgage Discrimination, and the Fair Housing Act*, 45 HARVARD CIVIL RIGHTS-CIVIL LIBERTIES LAW REV. 375, 382 (2010).

[9] Alliance of Californians for Community Empowerment, *California in Crisis: How Wells Fargo's Foreclosure Pipeline is Damaging Local Communities* (2013) pg. 6 *available at* www.calorganize.org.

"most or all of the hard-won gains in homeownership made by low-income and minority communities in the past 15 years or so have been reversed."[10]  The resulting impact of these practices represents "nothing short of the preeminent civil rights issue of our time, erasing, as it has, a generation of hard fought wealth accumulation among African Americans."[11]

## II.      PARTIES

24.      Plaintiff City of Los Angeles is a municipal corporation, organized pursuant to Article XI of the California Constitution.  The City is authorized by the City Council to institute suit to recover damages suffered by the City as described herein.

25.      Defendant JPMorgan Chase & Co. ("JPMorgan & Co."), headquartered in New York, New York, operates under two brand names:  JPMorgan and J.P.Morgan.  The U.S. consumer and commercial banking businesses operate under the JPMorgan brand, and include its home finance and home equity loan business. JPMorgan & Co., in its current structure, is the result of the combination of several large U.S. banking companies over the last decade including JPMorgan Manhattan Bank, J.P. Morgan & Co., Bank One, Bear Stearns and Washington Mutual.  Upon information and belief, Plaintiff alleges that JPMorgan & Co. owns and/or operates JPMorgan Chase Bank, N.A. and JPMorgan Manhattan Bank USA, N.A.  JPMorgan & Co.'s operates a Consumer & Community Banking segment, which includes a mortgage banking business (*i.e.*, mortgage production, servicing, and real estate portfolios).

26.      On September 25, 2008, the Office of Thrift Supervision seized Washington Mutual's ("WaMu") assets and operations and placed them into

---

[10] Bernanke, *supra* n.2 at pg. 3.

[11] Charles Nier III and Maureen St. Cyr, *A Racial Financial Crisis: Rethinking the Theory of Reverse Redlining to Combat Predatory Lending Under the Fair Housing Act*, 83 TEMPLE LAW REV. 941, 942 (2011).

1   receivership with the Federal Deposit Insurance Corporation ("FDIC").  Pursuant to a

2   Purchase and Assumption Agreement ("Agreement"), the FDIC later sold

3   substantially all of WaMu's assets and a significant amount of its liabilities to

4   JPMorgan & Co for $1.9 billion.  The liabilities assumed by JPMorgan & Co. include

5   the claims alleged by Los Angeles herein.

6        27.    Section 2.1 of the Agreement titled "Liabilities Assumed by Assuming

7   Bank" provides as follows:

8            Subject to Sections 2.5 and 4.8 the Assuming Bank [JPMorgan & Co.]
             Chase] expressly assumes at Book Value (subject to adjustment pursuant
9            to Article VIII) and agrees to pay, perform, and discharge, all of the
10           liabilities of the Failed Bank [WaMu] which are reflected on the Books
             and Records of [WaMu] as of Bank Closing [September 25, 2008],
11           including the Assumed Deposits and all liabilities associated with any and
             all employee benefit plans, except as listed on the attached Schedule 2.1,
12           and as otherwise provided in this Agreement (such liabilities referred
             to as "Liabilities Assumed").  Notwithstanding Section 4.8, [JPMorgan &
13           Co.] specifically assumes all mortgage servicing rights and obligations of
14           [WaMu].

15

16       28.    Section 2.5 of the Agreement titled "Borrower Claims" provides as

17   follows:

18           Notwithstanding anything to the contrary in this Agreement, any
             liability associated with *borrower claims* for payment of or liability
19           to any *borrower* for monetary relief, or that provide for any other
20           form of relief to any *borrower*, whether or not such liability is
             reduced to judgment, liquidated or unliquidated, fixed or contingent,
21           matured or unmatured, disputed or undisputed, legal or equitable,
22           judicial or extra-judicial, secured or unsecured, whether asserted
             affirmatively or defensively, related in any way to any loan or
23           commitment to lend made by the Failed Bank [WaMu] prior to
24           failure, or to any loan made by a third party in connection with a
             loan which is or was held by [WaMu], or otherwise arising in
25           connection with [WaMu's] lending or loan purchase activities are
26           specifically not assumed by the Assuming Bank [JPMorgan & Co.].
             (emphasis added).
27

28

COMPLAINT FOR VIOLATION OF              - 12 -
THE FEDERAL FAIR HOUSING ACT
010346-11  691167 V1

29. Los Angeles is not a borrower, it is not pursuing a derivative claim on behalf of any borrower, and is not seeking damages on behalf of any borrower. Therefore, the exclusion for borrower claims set forth in Section 2.5 of the Agreement does not enable JPMorgan & Co. to avoid liability corresponding to claims pertaining to WaMu's mortgage originations at issue herein. Rather, in accordance with Section 2.1, JPMorgan & Co. is liable for these mortgage originations.

30. According to JPMorgan's 2012 10-K, "Mortgage Banking includes mortgage origination and servicing activities, as well as portfolios comprised of residential mortgages and home equity loans, including the purchased credit impaired ("PCI") portfolio acquired in the Washington Mutual transaction."

31. Defendant JPMorgan Chase Bank, N.A. ("JPMorgan Bank") is organized as a national banking association under the laws of the United States. Upon information and belief, its corporate headquarters are located in New York, New York. It maintains multiple offices in the State of California and specifically in the City of Los Angeles, for the purposes of soliciting applications for and making residential mortgage loans and engaging in other business activities. JPMorgan Bank also acquired JPMorgan Manhattan Bank USA, N.A. ("JPMorgan Manhattan").

32. Defendant Chase Manhattan Bank USA, N.A. is headquartered in New York, New York. Upon information and belief, Plaintiffs allege that JPMorgan Manhattan engaged in residential mortgage lending in California and other states throughout the country.

33. The Defendants in this action are, or were at all relevant times, subject to Federal laws governing fair lending, including the FHA and the regulations promulgated under each of those laws. The FHA prohibits financial institutions from discriminating on the basis of, *inter alia*, race, color, or national origin in their residential real estate-related lending transactions.

34.     The Defendants in this action are or were businesses that engage in residential real estate-related transactions in the City of Los Angeles within the meaning of the FHA, 42 U.S.C. § 3605.

35.     Based on information reported pursuant to the Home Mortgage Disclosure Act, in addition to loans that JPMorgan originated directly, Defendants are responsible for residential home loans acquired from, and/or sold by or through, WaMu, JPE Home Finance LLC, Long Beach Mortgage Co., Encore Credit Corp., Bear Stearns Residential Mortgage, Performance Credit Corp., and Bravo Credit Corp.

36.     Upon information and belief, Plaintiff alleges that each of the Defendants was and is an agent of the other Defendants.  Each Defendant, in acting or omitting to act as alleged in this Complaint, was acting in the course and scope of its actual or apparent authority pursuant to such agencies, and/or the alleged acts or omissions of each Defendant as agent were subsequently ratified and adopted by each agent as principal.  Each Defendant, in acting or omitting to act as alleged in this Complaint, was acting through its agents, and is liable on the basis of the acts and omissions of its agents.

## III.   JURISDICTION AND VENUE

37.     This Court has jurisdiction over this matter pursuant to 42 U.S.C. § 3613 and 28 U.S.C. §§ 1331, 1343, because the claims alleged herein arise under the laws of the United States.

38.     Venue is proper in this district under 28 U.S.C. § 1391(b) because JPMorgan conducts business in this district and a substantial part of the events and omissions giving rise to the claims occurred in this district.

# IV.   FACTUAL BACKGROUND

A.   **Background Regarding Discriminatory Loan Practices, Reverse Redlining, and Redlining**

39.   Prior to the emergence of subprime lending, most mortgage lenders made only "prime" loans.  Prime lending offered uniformly priced loans to borrowers with good credit, but individuals with lower credit were not eligible for prime loans.

40.   Subprime lending developed and began growing rapidly in the mid-1990s as a result of technological innovations in risk-based pricing and in response to the demand for credit by borrowers who were denied prime credit by traditional lenders.  Advances in automated underwriting allowed lenders to predict with improved accuracy the likelihood that a borrower with lower credit will successfully repay a loan.  These innovations gave lenders the ability to adjust the price of loans to match the different risks presented by borrowers whose credit records did not meet prime standards.  Lenders found that they could now accurately price loans to reflect the risks presented by a particular borrower.  When done responsibly, this made credit available much more broadly than had been the case with prime lending.

41.   Responsible subprime lending has opened the door to homeownership to many people, especially low- to moderate-income and minority consumers, who otherwise would have been denied mortgages.  At the same time, however, subprime lending has created opportunities for unscrupulous lenders to target minorities and engage in discriminatory, irresponsible lending practices that result in loans that borrowers cannot afford.  This, in turn, leads directly to defaults and foreclosures.

42.   Enticed by the prospect of profits resulting from exorbitant origination fees, points, and related pricing schemes, some irresponsible subprime lenders took advantage of a rapidly rising real estate market to convince borrowers to enter into discriminatory loans that had unfair terms that they could not afford.  Often this was accomplished with the help of deceptive practices and promises to refinance at a later

date.  These abusive subprime lenders did not worry about the consequences of default or foreclosure to their business because, once made, a significant number of the loans were sold on the secondary market.

43.    As the subprime market grew, the opportunities for abusive practices grew with it.  As a consequence, the federal government has found that abusive and predatory practices "are concentrated in the subprime mortgage market."[12]  These practices, which in recent years have become the target of prosecutors, legislators, and regulators, include the following:

a.    Placing borrowers in subprime loans even though they qualify for loans on better terms.

b.    Failing to prudently underwrite hybrid adjustable rate mortgages (ARMs), such as 2/28s and 3/27s.[13]  After the borrower pays a low "teaser rate" for the first two or three years, the interest rate on these loans resets to a much higher rate that can continue to rise based on market conditions.  Subprime lenders often underwrite these loans based only on consideration of whether the borrower can make payments during the initial teaser rate period, without regard to the sharply higher payments that will be required for the remainder of a loan's 30-year term.  Irresponsible lenders aggressively market the low monthly payment that the borrower will pay during the teaser rate period, misleading borrowers into believing that they can afford that same low monthly payment for the entire 30-year term of the loan, or that they can refinance their loan before the teaser rate period expires.

---

[12] United States Department of Housing & Urban Development and United States Department of the Treasury, Curbing Predatory Home Mortgage Lending (2000), at 1 (*available at* http://www.huduser.org/Publications/pdf/treasrpt.pdf) ("HUD/Treasury Report").

[13] In a 2/28 ARM, the "2" represents the number of years the mortgage will be fixed over the term of the loan, while the "28" represents the number of years the interest rate paid on the mortgage will be variable.  Similarly, in a 3/27 ARM, the interest rate is fixed for three years and variable for the remaining 27-year amortization.

c.      Failing to prudently underwrite refinance loans, where borrowers substitute unaffordable mortgage loans for existing mortgages that they are well-suited for and that allow them to build equity.  Such refinanced loans strip much or even all of that equity by charging substantial new fees, often hiding the fact that the high settlement costs of the new loan are also being financed.  Lenders that aggressively market the ability of the borrower to pay off existing credit card and other debts by refinancing all of their debt into one mortgage loan mislead borrowers into believing that there is a benefit to debt consolidation, while obscuring the predictable fact that the borrower will not be able to repay the new loan.  The refinanced loans are themselves often refinanced repeatedly with ever-increasing fees and higher interest rates, and with ever-decreasing equity, as borrowers seek to stave off foreclosure.

d.      Allowing mortgage brokers to charge "yield spread premiums" for qualifying a borrower for an interest rate that is higher than the rate the borrower qualifies for and can actually afford.

e.      Failing to underwrite loans based on traditional underwriting criteria such as debt-to-income ratio, loan-to-value ratio, FICO score, and work history.  Properly applying these criteria ensure that a borrower is obtaining a loan that he or she has the resources and assets to repay, and ignoring them results in many loans that bear no relation to borrowers' ability to repay them.  This allows the lender to make a quick profit from the origination, but sets the borrower up for default and foreclosure.

f.      Requiring substantial prepayment penalties that prevent borrowers whose credit has improved from refinancing their subprime loan to a prime loan. Prepayment penalties not only preclude borrowers from refinancing to a more affordable loan, but reduce the borrowers' equity when a subprime lender convinces borrowers to needlessly refinance one subprime loan with another.

g.     Charging excessive points and fees that are not associated with any increased benefits for the borrower.

44.     The problem of predatory practices in mortgage lending is particularly acute in minority communities because of "reverse redlining."  As used by Congress and the courts, the term "reverse redlining" refers to the practice of targeting residents in certain geographic areas for credit on unfair terms due to the racial or ethnic composition of the area.  This is in contrast to "redlining," which is the practice of denying equal access to credit to specific geographic areas because of the racial or ethnic composition of the area.  Both practices have repeatedly been held to violate the Federal Fair Housing Act.

45.     Following the onset of the subprime mortgage crisis, and after years of issuing abusive home loans in minority neighborhoods, the big bank lenders began to limit the issuance of mortgage credit to minority borrowers (*i.e.*, refusing to refinance predatory loans).  At the same time, when the big banks did extend credit, they continued to do so on predatory terms.

## V.     JPMORGAN ENGAGED IN DISCRIMINATORY LENDING PRACTICES

### A.     JPMorgan's Conduct Had a Disparate Impact on Minority Borrowers in Violation of the Fair Housing Act

#### 1.     Discriminatory lending results in a disproportionate number of foreclosures in minority areas.

46.     Foreclosures are on the rise in many of the nation's most vulnerable neighborhoods, particularly those with substantial concentrations of minority households.  The increase appears to stem from the growing presence of (1) non-conventional lending in these communities and (2) continuing discriminatory lending practices (*e.g.*, steering minorities into loan products with more onerous terms – which happen to be more profitable for JPMorgan).

47.     A seminal report on foreclosure activity by Mark Duda and William Apgar documents the negative impact that rising foreclosures have on low-income and low-wealth minority communities, using Chicago as a case study.  Mr. Apgar is a Senior Scholar at the Joint Center for Housing Studies of Harvard University, and a Lecturer on Public Policy at Harvard's John F. Kennedy School of Government.  He previously served as the Assistant Secretary for Housing/Federal Housing Commissioner at the U.S. Department of Housing and Urban Development, and also Chaired the Federal Housing Finance Board.  Mr. Apgar holds a Ph.D. in Economics from Harvard University.  Mr. Duda is a Research Fellow at the Joint Center for Housing Studies.  The Apgar-Duda report has continually been cited by subsequent governmental, public sector, and private sector reports due to its clarity and thoroughness with respect to the negative impact foreclosures have on lower-income and minority neighborhoods.[14]

48.     This significant report highlights the foreseeability of foreclosures arising from predatory lending practices and their attendant harm, demonstrating that such foreclosures impose significant and predictable costs on borrowers, municipal governments, and neighboring homeowners.

49.     Another report, by the Center for Responsible Lending, uses a national dataset to show that the foreclosure rate for low- and moderate-income African-Americans is approximately 1.8 times higher than it is for low- and moderate-income non-Hispanic whites.  The gap is smaller for Latinos, especially among low-income households, but even among low-income Latinos the foreclosure rate is 1.2 times that of low-income whites.  Racial and ethnic disparities in foreclosure rates cannot be explained by income, since disparities persist even among higher-income groups.  For

---

[14] *See* W. Apgar, M. Duda & R. Gorey, *The Municipal Costs of Foreclosures:  A Chicago Case Study* (2005) (*available at* http://www.nw.org/network/neighborworksProgs/foreclosuresolutions/documents/2005 Apgar-DudaStudy- FullVersion.pdf).

example:  approximately 10 percent of higher-income African-American borrowers and 15 percent of higher-income Latino borrowers have lost their home to foreclosure, compared with 4.6 percent of higher income non-Hispanic white borrowers.  Overall, low- and moderate-income African-Americans and middle- and higher-income Latinos have experienced the highest foreclosure rates.[15]

50.     Nearly 20 percent of loans in high-minority neighborhoods have been foreclosed upon or are seriously delinquent, with significant implications for the long-term economic viability of these communities.[16]

**2.      Minority neighborhoods are disproportionate recipients of predatory loans.**

51.     There is a substantial body of empirical evidence demonstrating the prevalence of reverse redlining in the subprime mortgage market.  These studies show that, even after controlling for creditworthiness and other legitimate underwriting factors, subprime loans and the predatory practices often associated with subprime lending are disproportionately targeted at minority neighborhoods.[17]

---

[15] Center for Responsible Lending, *Lost Ground, 2011: Disparities in Mortgage Lending and Foreclosures* (2011) (*available at* www.responsiblelending.org/-mortgage-lending/research-analysis/*Lost-Ground-2011*.pdf).

[16] *Id.*

[17] *See* Abt Associates, *Using Credit Scores to Analyze High-Cost Lending in Central City Neighborhoods* (2008); Center for Responsible Lending, *Lost Ground, 2011:  Disparities in Mortgage Lending and Foreclosures* (2011) (*available at* www.-responsiblelending.org/mortgage-lending/research-analysis/*Lost-Ground-2011*.pdf ); Center for Responsible Lending, *Unfair Lending: The Effect of Race and Ethnicity on the Price of Subprime Mortgages* (2006) (*available at* http://www.responsiblelending.org/mortgage-lending/research-analysis/rr011-Unfair_Lending-0506.pdf); Finance and Economics Discussion Series Divisions of Research & Statistics and Monetary Affairs Federal Reserve Board, Washington, D.C, *Subprime Mortgages: What, Where, and to Whom?* (2008) (*available at* http://www.nber.org/papers/w14083.pdf?new_window=1 ); C. Reid and E. Laderman, Federal Reserve Bank of San Francisco, *The Untold Costs of Subprime Lending: Examining the Links among Higher-Priced Lending, Foreclosures and Race in California,* Presented at Brandeis University (2009) (*available at* http://iasp.brandeis.edu/pdfs/Author/reid-carolin/The%20Untold%20Costs%20of%20Subprime%20Lending%203.pdf ).

52.     In general, as recently observed by the Federal Reserve in December 2012, both African-American and Hispanic borrowers were far more likely (in fact, nearly twice as likely) to obtain higher-priced loans than were white borrowers.  These relationships hold both for home-purchase and refinance lending and for non-conventional loans.  These differences are reduced, but not eliminated, after controlling for lender and borrower characteristics.  "Over the years, analyses of HMDA data have consistently found substantial differences in the incidence of higher-priced lending [] across racial and ethnic lines, differences that cannot be fully explained by factors included in the HMDA data."[18]

53.     African-Americans and Hispanics were much more likely to receive subprime loans and loans with features that are associated with higher foreclosures, specifically prepayment penalties and hybrid or option ARMs.  These disparities were evident even comparing borrowers within the same credit score ranges.  In fact, the disparities were especially pronounced for borrowers with higher credit scores.  For example, among borrowers with a FICO score of over 660 (indicating good credit), African-Americans and Latinos received a high interest rate loan more than three times as often as white borrowers.[19]

54.     In addition to receiving a higher proportion of higher-rate loans, African-Americans and Latinos also were much more likely to receive loans with other risky features, such as hybrid and option ARMs and prepayment penalties.  Disparities in the incidence of these features are evident across all segments of the credit spectrum.[20]

---

[18] Federal Reserve Bulletin, *The Mortgage Market in 2011: Highlights from the Data Reported under the Home Mortgage Disclosure Act* (Dec. 2012) (*available at* http://www.federalreserve.gov/pubs/bulletin/2012/PDF/2011_HMDA.pdf ).

[19] Center for Responsible Lending, *Lost Ground, 2011: Disparities in Mortgage Lending and Foreclosures* (2011) (*available at* www.responsiblelending.org/-mortgage-lending/research-analysis/*Lost-Ground-2011*.pdf).

[20] *Id.*

55.    A 2010 Report from the California Reinvestment Coalition finds:  "[The] hardest-hit communities are racially concentrated, low to moderate income areas of African-Americans and Latinos that were saturated with high-cost, subprime lending since 2000.  Neighborhoods once redlined – where lenders refused to lend in neighborhoods of color without regard to the actual financial qualifications of residents – were flooded in the past decade with high-cost subprime loans and abusive option ARM loans.  These loans were often unaffordable and unsustainable for working class families, and inevitably led to large scale foreclosures.  In the past two years, borrowers and communities struggling to preserve their primary asset – their home – have found that banks are not willing to work with them to restructure their mortgages or to offer new loans."[21]  Key findings from the 2010 Report include:

(a)    In 2008, minority neighborhoods contained roughly 63% of the housing in Los Angeles, but suffered over 90% of the City's foreclosures.

(b)    While predatory and fraudulent lending helped precipitate the foreclosure crisis, a wave of a resetting option ARM loans threatens to keep California immobilized by foreclosure beyond 2010.

(c)    California cities are more likely than the national average to be saturated with low documentation loans (*e.g.*, stated income loans).  In Los Angeles, 74% of all loans in the sample were made with limited documentation, as compared to only 56% for all loans in the sample.

(d)    Minority neighborhoods saw a dramatic decrease in lower cost prime loans in 2008.  The drop off from 2006 to 2008 was stunning.  In Los Angeles, less than 1/3rd as many prime loans were made available by big bank lenders in minority neighborhoods in 2008, as compared to 2006.

(e)    In 2008, nearly one out of two African-Americans and Latinos seeking a home loan or refinance were denied, as compared to only about one in four whites.

---

[21] California Reinvestment Coalition, *From Foreclosure to Re-Redlining* (2010) (*available at* http://www.community-wealth.org/sites/clone.community-wealth.org/files/downloads/report-stein-gwynn.pdf ).

(f)     Even though high-cost lending began to decrease significantly by 2008, when it occurred, it was still more likely to occur in minority neighborhoods as compared to white neighborhoods.  The big bank lenders still were more than twice as likely to sell subprime loans in minority neighborhoods in Los Angeles, as compared to white neighborhoods.

(g)     In many cases, minority borrowers were overburdened not only by subprime lending but by other onerous loan terms, such as prepayment penalties, yield spread premiums, option ARMs, and HELOCs, all of which have been conducive to foreclosures.

(h)     In a March 2009 survey, two-thirds of housing counselors reported that they believed borrowers of color were receiving worse foreclosure prevention outcomes than white borrowers.

(i)     In the wake of the subprime meltdown, as underwriting tightened for all loans, higher cost FHA mortgage loans were the "only game in town" left for many new homebuyers.

56.     Since 2008, as the data discussed below makes clear, there has been a shift in the types of loans issued – and not issued – by the Bank.  For example, the Bank shifted from offering new subprime loans toward issuing more Home Equity Lines of Credit ("HELOCs") and higher cost FHA/VA loans.[22]  FHA and VA government loans are characterized as higher risk loans because (1) they are typically more expensive for a borrower than conventional loans and include fees and costs not associated with conventional loans, and (2) several of the government loan programs permit negative amortization.[23]  At the same time, in the last several years, the Bank tightened lending requirements in a manner that drastically limited the ability of

---

[22] While FHA/VA loans are not inherently predatory, these loans have higher risk features such as higher fees and higher interest rates.  When banks target minorities for FHA/VA loans and issue more of them to minorities, they are acting in a discriminatory manner.

[23] California Reinvestment Coalition, *et al.*, *Paying More for the American Dream VI, Racial Disparities in FHA/VA Lending* (July 2012); www.fha.com/fha_loan_types; www.benefits.va.gov/homeloans.

COMPLAINT FOR VIOLATION OF
THE FEDERAL FAIR HOUSING ACT
010346-11  691167 V1

- 23 -

minority borrowers to refinance or otherwise modify the subprime loans previously issued by the Bank.

57.    A 2011 Report from the California Reinvestment Coalition found that, between 2008 and 2009, in Los Angeles, the number of conventional refinance loans made in predominantly white neighborhoods more than doubled (increasing by about 200%), while conventional refinance loans declined in the City's minority neighborhoods, where such refinancing was most desperately needed.[24]

58.    At the same time that conventional credit has contracted over the past five years, FHA lending has expanded dramatically.  During the subprime boom, FHA lending fell as subprime lenders targeted minority communities.  Now, with little or no subprime lending, and conventional credit restricted, FHA lending has shot up.  Overall, the share of loans with government backing went from 5% in 2005 to 26.6% in 2010.[25]

59.    For African-Americans, the share of mortgages used to purchase a home and backed by a government program increased to almost 80% in 2010; for Latinos the share increased to 73%.  But for whites, the share increased to only 49%.  At present, most minority borrowers cannot gain access to the conventional mortgage market, and instead, are relegated to more expensive FHA loans.[26]

60.    A 2012 Report from the California Reinvestment Coalition "shows that black and Latino borrowers and borrowers in communities of color received government-backed loans – insured by the Federal Housing Administration (FHA) or

---

[24] California Reinvestment Coalition, *et al.*, *Paying More for the American Dream V: The Persistence and Evolution of the Dual Market* (2011) (*available at* http://www.community-wealth.org/sites/clone.community-wealth.org/files/downloads/report-crc-et-al.pdf).

[25] Center for Responsible Lending, *The State of Lending in America & its Impact on U.S. Households* (2012) (*available at* http://www.responsiblelending.org/state-of-lending/State-of-Lending-report-1.pdf).

[26] Center for Responsible Lending, *The State of Lending in America & its Impact on U.S. Households* (2012) (*available at* http://www.responsiblelending.org/state-of-lending/State-of-Lending-report-1.pdf).

guaranteed by the Department of Veterans Affairs (VA) – significantly more often than did white borrowers. The findings indicate persistent mortgage redlining and raise serious concerns about illegal and discriminatory loan steering.… [T]he report shows a pattern of two-tiered lending, in which borrowers and communities of color received disproportionately fewer conventional mortgages and disproportionately more government-backed loans than did white borrowers and communities…. [T]he disproportionate prevalence of FHA loans in communities of color raises fair lending flags." In particular, the 2012 Report observes that: "In Los Angeles, homebuyers in neighborhoods of color received government-backed loans five times more often than did those in predominantly white neighborhoods…. [H]omeowners in communities of color received FHA or VA refinance loans 6.5 times more often than did homeowners in predominantly white neighborhoods."[27]

**B.     JPMorgan Intentionally Discriminated Against Minority Borrowers in Violation of the Fair Housing Act, as Demonstrated by Former Bank Employees**

61.     Confidential Witnesses ("CWs") are former employees of JPMorgan and WaMu. The CWs were responsible for making, processing, and/or underwriting loans in the greater Los Angeles region. CWs describe how JPMorgan and WaMu targeted minorities and residents of minority neighborhoods in and around Los Angeles for predatory lending practices.

62.     CW1 worked for JPMorgan in two branches in Los Angeles County as a mortgage loan officer. CW1 worked for JPMorgan for approximately two years in the 2008-2010 timeframe. She was previously employed as a mortgage loan officer at WaMu for about a year before JPMorgan purchased WaMu. She worked almost

---

[27] California Reinvestment Coalition, *Paying More for the American Dream VI: Racial Disparities in FHA/VA Lending* (2012) (*available at* http://calreinvest.org/system/resources/W1siZiIsIjIwMTIvMDcvMTgvMTZfMzVfMj NfMV9wYXlpbmdtdb3JlVklfbXVsdGlzdGF0ZV9qdWx5MjAxMl9GSU5BTC5wZGY iXV0/payingmoreVI_multistate_july2012-%20FINAL.pdf).

entirely with minority (largely Hispanic) customers, almost all of whom sought refinancing or loan modifications.

63.    CW2 worked in the mortgage industry for about eight years; he worked for JPMorgan at multiple branch locations in the greater Los Angeles region as a mortgage loan originator in the 2011-2012 timeframe.

64.    CW3 worked as an underwriter at the Bank's corporate office in Los Angeles during the 2009-2011 timeframe.  She was previously employed at WaMu, where she was hired in 2002.  She worked at WaMu through the period when JPMorgan purchased it in 2009, and then she became a JPMorgan employee.  She worked as a loan modification underwriter with customers who were behind on their mortgage payments.

65.    CW4 worked as a loss mitigation negotiator and underwriter at a JPMorgan branch in Los Angeles during the 2009-2010 timeframe.  He worked with customers who had missed mortgage payments, and he was responsible for making loan modifications for customers in the default process.

66.    CW5 worked as a senior loan officer for WaMu in the 2003 to 2007 time frame, originating loans throughout the Los Angeles area.  During the course of his work, CW5 observed that WaMu targeted marketing materials and high-cost loan products for low-income minorities, and WaMu incentivized the sales force to make high-cost loans.

67.    The CWs confirm that JPMorgan has engaged in predatory and otherwise discriminatory lending practices directly and through acquired lenders (including WaMu).

**1.    JPMorgan targets minorities for predatory loan terms (and pays its employees more for doing so).**

68.    CW5 observed that WaMu tailored marketing materials for certain minorities. "If you wanted to target the Hispanic community you had to have certain

words in there that you'd want to use to attract (the borrowers)," he said. CW5 understood that certain mortgage loan products, like negative amortization loans, were tailored toward low-income minorities. "It was tailored for minorities, but it was not specifically just for them," he added.

69.     According to CW5, WaMu incentivized salespeople through commissions and bonuses to push applicants into negative amortization and other non-conventional loans.

**2.     JPMorgan underwrites adjustable rate loans that borrowers cannot afford.**

70.     CW3, who worked with customers who were behind on their mortgage payments, explained that most of these customers had received variable-rate loans that they could no longer afford after the rates adjusted upward.

71.     According to CW5, "a lot of [minorities] hold onto their cash instead of putting it in the bank.  That's the client; we had a program for them. We would take non-traditional credit."  WaMu would qualify these minority borrowers for much more expensive subprime loans and large negative amortization loans with extremely low introductory monthly payments.  "At one point WaMu did not have a credit score requirement," he said.  "It was easy to throw them into that program and get them approved for that program at the one percent rate" – and loan officers and underwriters only had to qualify the borrowers for the lowest monthly payment required during the introductory period.  CW5 explained that loan officers did not always fully explain the onerous repercussions of such loans.  "That's where a lot of clients were misled," he said.  "They thought it was a 1 percent fixed (rate)."

72.     In CW5's experience, loan officers tended to push negative amortization loans on low-income minorities.  He observed that many borrowers got into deep financial trouble after taking out these types of loans.  "The (initial monthly) cost was bare minimum" for the borrower, he said. "But the possibilities were there that it could

turn out to be the worst case (scenario) for the borrowers, and that's exactly what happened."

73.     JPMorgan (directly and through acquired lenders) does not properly underwrite these loans when made to minorities and in minority neighborhoods. JPMorgan does not adequately consider the borrowers' ability to repay these loans, especially after the teaser rate expires and the interest rate increases.  The fact that these loans would result in delinquency, default, and foreclosure for many borrowers was, or should have been, clearly foreseeable to JPMorgan at the time the loans were made.

**3.     JPMorgan tends to require prepayment penalties more often from minority borrowers.**

74.     Prepayment penalties typically make it more difficult for borrowers to refinance into new and better loans.

75.     CW3 observed that JPMorgan tended to require prepayment penalties more often from minority borrowers.

76.     CW5 explained that WaMu incentivized sales people with big bonuses for locking borrowers into loans with prepayment penalties.

**4.     JPMorgan induced foreclosures by failing to offer refinancing or loan modifications to minority customers on fair terms, and otherwise limiting equal access to fair credit.**

77.     The CW statements show that JPMorgan induced foreclosures by failing to offer refinancing or loan modifications to minority customers on fair terms – which constitutes a particularly egregious form of redlining, given that minority borrowers sought refinancing or loan modifications with respect to bad loans that the Bank previously made to them.

78.     CW1 believes that JPMorgan adopted overly-stringent loan qualification requirements that resulted in an unnecessarily high rate of refinancing rejections for minority borrowers.  She encountered months-long delays and very few successes

when attempting to refinance minority customers.  She estimates that 90% of the minority borrowers who came to her branches desperate for refinancing would not qualify.  They usually did not have enough income or enough equity in their homes, she said.

79.     CW1 explained that many minority borrowers who had previously received "no doc" loans were now asked to provide documentation of income and other assets, and could not.  She described seeing customers who only owed "$50,000 to $60,000" on a property worth $250,000 who could not refinance because they either didn't have a job or did have a job but had insufficient documentation.  Many others had income but too little equity in their homes because of falling real estate values.

80.     CW1 said some of these customers were rejected even though she believed they should not have been rejected.  According to CW1, JPMorgan's refinancing qualification guidelines became "much more conservative" than those set by federal guidelines.  "That was really heartbreaking," she said. "Seeing people sitting there crying. … Those were kind of hard."

81.     According to CW1, borrowers who did not qualify for refinancing, and thus sought loan modifications, were essentially encouraged not to make payments on their homes at all.  She said the Bank informed them that a prerequisite for loan modification was missing payments.  This created more problems, she explained, because some of these same borrowers would follow the guidance, skip payments, but then not receive loan modifications.  After that, "they were just waiting for the sheriff to come around" and foreclose, she said.

82.     CW1 said that, when refinancing did take place in her minority neighborhood branches, it usually came with higher-than-usual interest rates that corresponded with rising LTV ratios.

83.     During CW1's employment, JPMorgan withdrew mortgage officers from both minority neighborhood branches where she worked because "it just wasn't

feasible to have a loan officer there," she said.  "The loans just weren't going through in that area," she said.  "It wasn't worth it to have someone there."

84.    CW2 said that JPMorgan has tightened its lending requirements since 2008, making almost all loans "fully-doc'd" loans, setting higher standards ("overlays") for refinancing than those established under HAMP.  "The banks said, 'we're not going to refinance you,'" he said.  "The purpose of the [HAMP] program was to get people out of these bad loans, and the banks refused to do it.  And this is still going on today."

85.    The Bank operated few, if any, branches in minority neighborhoods of Los Angeles; CW2 strongly believes that this evidenced an intentional form of minority "discrimination."  In the last few years, it became increasingly difficult to serve minority customers given where the Bank chose to locate its branches, he explained.  To find out "how they are discriminating, look at the position of the branches," he said.  "That's going to show you."

86.    JPMorgan is opening "huge numbers" of branches all across California, none of which are located in the inner city, according to CW2.  In the upper-middle-class neighborhood where he lives, JPMorgan is opening what he said appeared to be as many as seven branches, maybe more.  Another 300 are slated to open in Southern California, part of 2,000 that will be opening across the state, he said.  "But none of this is happening in minority neighborhoods," he added.  "That, in itself, is the biggest indication of discrimination that you can find."

87.    CW2 confirmed that JPMorgan recorded minority status information in the loan application process.  CW2 believed that some of the minority borrowers he saw at JPMorgan should have qualified for refinancing, but they did not qualify for reasons that were unclear to him.  He suspected that minority status played a role in decision-making by JPMorgan on who to finance.  "The redlining and stuff like that, that still goes on."

88.     CW2 explained that JPMorgan might offer some minority borrowers "subprime" refinancing, if they were ineligible for HAMP loan modifications. Such loans typically offered interest rates that gradually increased over several years.

89.     CW3 said: "There were a lot of things with which I didn't agree" at JPMorgan. She said there were generally "a lot of policy changes … things that would happen that the customer wouldn't know about." For example, she noted: "Customers would send in their information and we would get it," then documents would go missing. "Everything was messy," she said, due to the Bank's "bad managers." As a result, she said, borrowers fell deeper behind on payments and into foreclosure. "A lot of times there was no mercy," she said, referring to the Bank's practices of putting people into foreclosure while loan modifications were pending.

90.     CW4 observed that JPMorgan denied minority borrowers loan modifications in large percentages in the City of Los Angeles because many who were in foreclosure under old stated-income mortgages were unable to get approved under the Bank's new document-based income guidelines.

**5.      JPMorgan engages in other abusive lending practices.**

91.     The CW statements further demonstrate that the Bank increased the costliness of non-conventional loans at the expense of minority borrowers.

92.     CW3 estimated that about 35% of the borrowers she dealt with had been victims of unethical lending practices by JPMorgan. CW3 also observed that minority borrowers tended to receive higher interest rates. Addressing the type of minority borrowers that tended to face higher interest rates at JPMorgan, she said, "the people who didn't understand English and stuff like that."

93.     CW3 also observed that smaller home loans at JPMorgan – somewhere between $75,000 and $100,000 and below – tended to come with much higher interest rates (*e.g.*, 3%-4% higher), which inevitably impacted minority borrowers more than non-minority borrowers.

## C.     Minorities in Fact Receive Predatory Loan Terms from JPMorgan

94.     As discussed herein, JPMorgan's *predatory* loans include:  high-cost loans (*i.e.*, loans with an interest rate that was at least three percentage points above a federally-established benchmark), subprime loans, interest-only loans, balloon payment loans, loans with prepayment penalties, negative amortization loans, no documentation loans, and/or ARM loans with teaser rates (*i.e.*, lifetime maximum rate > initial rate + 6%).

95.     Data reported by the Bank and available through public databases shows that in 2004-2011, 26.3% of loans made by JPMorgan to African-American and Latino customers in Los Angeles were high cost, but only 7.4% of loans made to white customers in Los Angeles were high cost.  This data demonstrates a pattern of statistically significant[28] differences in the product placement for high cost loans between minority and white borrowers.

96.     The following map of JPMorgan predatory loans originated in Los Angeles between 2004-2011 illustrates the geographic distribution of predatory loans in African-American and Latino neighborhoods and white neighborhoods in Los Angeles.  This map demonstrates that JPMorgan's predatory loans are disproportionately located in minority neighborhoods.

---

[28] Statistical significance is a measure of probability that an observed outcome would not have occurred by chance.  As used in this Complaint, an outcome is statistically significant if the probability that it could have occurred by chance is less than 5%.



97.     The fact that predatory loans involving all of JPMorgan's loan products are more heavily concentrated in minority neighborhoods in Los Angeles is consistent with the practice of reverse redlining and, upon information and belief, has contributed significantly to the disproportionately high rates of foreclosure in minority communities in Los Angeles.

**D.     Minorities in Los Angeles Receive Such Predatory Loan Terms from JPMorgan Regardless of Creditworthiness**

98.     According to *Discretionary Pricing, Mortgage Discrimination, and the Fair Housing Act*, 45 HARVARD CIVIL RIGHTS-CIVIL LIBERTIES LAW REV. 375, 398 (2010), several studies dating back to 2000 have established that minority borrowers were charged higher interest rates/fees than similar creditworthy white borrowers.

99.    Likewise, according to *A Racial Financial Crisis*, 83 TEMPLE LAW REV. 941, 947, 949 (2011), one study concluded that "even after controlling for underwriting variables, African-American borrowers were 6.1% to 34.3% more likely than whites to receive a higher rate subprime mortgage during the subprime boom." And another study found that significant loan pricing disparity exists among low risk borrowers – African-American borrowers were 65% more likely to receive a subprime home purchase loan than similar creditworthy white borrowers, and 124% more likely to receive a subprime refinance loan.

100.    Similarly, the Center for Responsible Lending's November 2011 Report, *Lost Ground, 2011:  Disparities in Mortgage Lending and Foreclosures*, stated that "racial and ethnic differences in foreclosure rates persist even after accounting for differences in borrower incomes."  Further, the Center stated it is "particularly troublesome" that minorities received riskier loans "even within [similar] credit ranges."  For example, among borrowers having FICO scores above 660, the incidence of higher rate loans among various groups was as follows:  whites – 6.2%; African-American – 21.4%; and Latino – 19.3%.

101.    Moreover, data reported by the Bank and available through public databases shows that minorities in Los Angeles received predatory loan terms from JPMorgan more frequently than white borrowers, regardless of creditworthiness.

102.    A regression analysis of this data controlling for borrower race and objective risk characteristics such as credit history, loan to value ratio, and the ratio of loan amount to income demonstrates that, from 2004-2011, an African-American borrower in Los Angeles was 1.795 times more likely to receive a predatory loan than was a white borrower possessing similar underwriting and borrower characteristics. The regression analysis further demonstrates that the odds that a Latino borrower in Los Angeles would receive a predatory loan were 1.576 times the odds that a white borrower possessing similar underwriting and borrower characteristics would receive a

predatory loan.  These odds ratios demonstrate a pattern of statistically significant differences between African-American and white borrowers and between Latino and white borrowers.[29]

103.  The regression analysis also shows that these disparities persist when comparing only Los Angeles-based borrowers with FICO scores above 660.  An African-American borrower with a FICO score above 660 was 2.026 times more likely to receive a predatory loan than was a white borrower with similar underwriting and borrower characteristics.  A Latino borrower with a FICO score above 660 was 1.796 times more likely to receive a predatory loan than was a white borrower with similar underwriting and borrower characteristics.  These odds ratios demonstrate a pattern of statistically significant differences between African-American and white borrowers and between Latino and white borrowers.

104.  A similar regression analysis taking into account the racial makeup of the borrower's neighborhood rather than the individual borrower's race shows that borrowers in heavily minority neighborhoods in Los Angeles were more likely to receive predatory loans than borrowers in heavily white neighborhoods.  For example, a borrower in a heavily minority census tract (census tract consisting of at least 80% African-American or Latino households) was 2.261 times more likely than was a borrower with similar characteristics in a heavily white neighborhood (census tract with at least 80% white households) to receive a predatory loan.  These odds ratios demonstrate a pattern of statistically significant differences between African-American and white borrowers and between Latino and white borrowers.

105.  This data also establishes that JPMorgan disproportionately issued government loans with higher risk features (FHA/VA) to African-American and Latino borrowers in Los Angeles from 2009-2011.  A regression analysis controlling

---

[29] As alleged throughout the Complaint, all references to the date range 2004-2011 are intended to include the time period up to and including December 31, 2011.

for borrower race and objective risk characteristics such as ratio of loan amount to income demonstrates that an African-American borrower was 2.660 times more likely to receive a higher risk government loan than was a white borrower possessing similar borrower and underwriting characteristics. The regression analysis further demonstrates that a Latino borrower was 2.857 times more likely to receive a higher risk government loan than was a white borrower possessing similar borrower and underwriting characteristics. These odds ratios demonstrate a pattern of statistically significant differences between African-American and white borrowers and between Latino and white borrowers in the City.

106.   Thus, the disparities are not the result of, or otherwise explained by, legitimate non-racial underwriting criteria.

**E.    JPMorgan's Targeting of Minorities who in Fact Receive Predatory Loan Terms Regardless of Creditworthiness Causes Foreclosures**

**1.    Data shows that JPMorgan's foreclosures are disproportionately located in minority neighborhoods in Los Angeles.**

107.   JPMorgan has intentionally targeted predatory practices at African-American and Latino neighborhoods and residents. Far from being a responsible provider of much-needed credit in minority communities, JPMorgan is a leading cause of stagnation and decline in African-American and Latino neighborhoods where its foreclosures are concentrated. Specifically, since at least 2000, its foreclosures have been concentrated in neighborhoods with African-American or Latino populations exceeding 80%.

108.   Although only 20.4% of JPMorgan's loan originations in Los Angeles from 2004 to 2011 were in census tracts that are at least 80% African-American or Latino, 24.5% of loan originations that had entered foreclosure by February 2013 were in those census tracts. Similarly, while only 36.0% of JPMorgan's loan originations in Los Angeles from 2004 to 2011 occurred in census tracts that are at least 50% African-American or Latino, 43.3% of JPMorgan's loan originations that had entered

foreclosure by February 2013 were in those census tracts.  Moreover, while 39.4% of JPMorgan's loan originations in Los Angeles from 2004 to 2011 occurred in census tracts that were less than 20% African-American or Latino, only 30.2% of JPMorgan's loan originations that had entered foreclosure by February 2013 were in those census tracts.  This data demonstrates a pattern of statistically significant differences between African-American and white borrowers and between Latino and white borrowers.

109.   The following map represents the concentration of JPMorgan's loan originations from 2004 through 2011 that had entered foreclosure by February 2013 in African-American and Latino neighborhoods.  In addition to the disproportionate distribution of JPMorgan foreclosures in African-American and Latino neighborhoods, disparate rates of foreclosure based on race further demonstrate JPMorgan's failure to follow responsible underwriting practices in minority neighborhoods.  While 19.2% of JPMorgan's loans in predominantly (greater than 80%) African-American or Latino neighborhoods result in foreclosure, the same is true for only 9.8% of its loans in predominantly (greater than 80%) white neighborhoods.  In other words, a JPMorgan loan in a predominantly African-American or Latino neighborhood is 2.190 times more likely to result in foreclosure as is a JPMorgan loan in a predominantly white neighborhood.  These odds ratios demonstrate a pattern of statistically significant differences between African-American and white borrowers and between Latino and white borrowers.

COMPLAINT FOR VIOLATION OF
THE FEDERAL FAIR HOUSING ACT
010346-11  691167 V1

- 37 -

Percent of Occupied Housing Units that are African-American or Hispanic, 2010

Over 80%
60.1% - 80%
40.1% - 60%
20.1% - 40%
20% or Less

JPMorgan Chase 2004-2011 Loan Originations that had Entered Foreclosure as of Feb. 2013
· 1 Dot = 1 Property

110.   Thus, JPMorgan's discretionary lending policies and pattern or practice of targeting of minorities, who in fact receive predatory loan terms regardless of creditworthiness, have caused and continue to cause foreclosures in Los Angeles.

**2.     Data shows that JPMorgan's loans to minorities result in especially quick foreclosures.**

111.   A comparison of the time from origination to foreclosure of JPMorgan's loans originated in Los Angeles shows a marked disparity with respect to the speed with which loans to African-Americans and Latinos and whites move into foreclosure. The average time to foreclosure for African-American borrowers is 2.906 years, and for Latino borrowers is 2.739 years. By comparison, the average time to foreclosure for white borrowers is 3.250 years. These statistically significant disparities demonstrate that JPMorgan aggressively moved minority borrowers into foreclosure as compared with how the Bank handled foreclosures for white borrowers.

112.   This disparity in time to foreclosure is further evidence that JPMorgan is engaged in lending practices consistent with reverse redlining.  The disparity in time to foreclosure demonstrates that JPMorgan is engaged in irresponsible underwriting in African-American and Latino communities that does not serve the best interests of borrowers.  If JPMorgan were applying the same underwriting practices in African-American and Latino neighborhoods and white neighborhoods in Los Angeles, there would not be a significant difference in time to foreclosure.  Were JPMorgan underwriting borrowers in both communities with equal care and attention to proper underwriting practices, borrowers in African-American and Latino communities would not find themselves in financial straits significantly sooner during the lives of their loans than borrowers in white communities.  The faster time to foreclosure in African-American and Latino neighborhoods is consistent with underwriting practices in minority communities that are less concerned with determining a borrower's ability to pay and qualifications for the loan than they are in maximizing short-term profit.

113.   The HUD/Treasury Report confirms that time to foreclosure is an important indicator of predatory practices:  "[t]he speed with which the subprime loans in these communities have gone to foreclosure suggests that some lenders may be making mortgage loans to borrowers who did not have the ability to repay those loans at the time of origination."[30]

**3.    Data shows that the discriminatory loan terms cause the foreclosures.**

114.   JPMorgan's discriminatory lending practices cause foreclosures and vacancies in minority communities in Los Angeles.

115.   Steering borrowers into loans that are less advantageous than loans for which they qualify, including steering borrowers who qualify for prime loans into subprime loans, can cause foreclosures because the borrowers are required to make higher loan payments.  The difference between what a borrower who is steered in this

---

[30] HUD/Treasury Report at 25.

manner must pay and the lower amount for which the borrower qualified can cause the borrower to be unable to make payments on the mortgage.  In such instances, the borrower would have continued to make payments on the mortgage and remained in possession of the premises had JPMorgan made the loan without improperly steering the borrower into a subprime, or less advantageous loan.  Steering borrowers in this manner, therefore, causes foreclosures and vacancies.

116.   Giving a loan to an applicant who does not qualify for the loan, especially a refinance or home equity loan, can also cause foreclosures and vacancies.  Some homeowners live in properties that they own subject to no mortgage.  Other homeowners live in properties with modest mortgages that they can comfortably afford to pay.  Where a lender, such as JPMorgan, solicits such a homeowner to take out a home equity loan on his or her property, or alternatively, to refinance his or her existing loan into a larger loan without proper underwriting to assure that the borrower can make the monthly payments for the new, larger loan, the result is likely to be that the borrower will be unable to make payments on the mortgage.  This is particularly true where the borrower is refinanced from a fixed-rate loan into an adjustable rate loan that the lender knows the borrower cannot afford should interest rates rise.  In some instances, the lender may refinance the borrower into a new loan that the lender knows the borrower cannot sustain, given the borrower's present debt obligations and financial resources.  In such circumstances, the likely result of such practices is to cause homeowners who are otherwise occupying properties without a mortgage, or comfortably making payments on a modest existing mortgage, to be unable to make payment on a new, unaffordable loan.  This, in turn, causes foreclosures and vacancies.  If these unaffordable refinance and home equity loans had not been made, the subject properties would not have become vacant.

117.   A regression analysis of loans issued by JPMorgan in Los Angeles from 2004-2011, controlling for objective risk characteristics such as credit history, loan to

COMPLAINT FOR VIOLATION OF
THE FEDERAL FAIR HOUSING ACT
010346-11  691167 V1

- 40 -

value ratio, and the ratio of loan amount to income demonstrates that a predatory loan is 1.726 times more likely to result in foreclosure than is a non-predatory loan.

118.   The regression analysis further demonstrates that a predatory loan in a heavily minority neighborhood (census tract consisting of at least 80% African-American and Latino households) is 2.946 times more likely to result in foreclosure as is a non-predatory loan with similar risk characteristics in a heavily white neighborhood (census tract with at least 80% white households).  These odds ratios demonstrate a pattern of statistically significant differences between African-American and white borrowers and between Latino and white borrowers.

119.   The regression analysis also demonstrates that a predatory loan made to an African-American borrower was 1.657 times more likely to result in foreclosure as was a non-predatory loan made to a white borrower with similar borrower and underwriting characteristics.  A predatory loan made to a Latino borrower was 2.232 times as likely to result in foreclosure as was a non-predatory loan made to a white borrower with similar risk characteristics.  These odds ratios demonstrate a pattern of statistically significant differences between African-American and white borrowers, and between Latino and white borrowers.

120.   A regression analysis of government loans (FHA/VA) issued by JPMorgan in Los Angeles from 2009-2011, controlling for borrower race and objective risk characteristics such as ratio of loan amount to income, demonstrates that a government loan is 5.559 times more likely to result in foreclosure as is a non-government loan.  These odds ratios demonstrate a pattern of statistically significant differences between African-American and white borrowers and between Latino and white borrowers.

## VI.   INJURY TO LOS ANGELES CAUSED BY JPMORGAN'S DISCRIMINATORY LOAN PRACTICES

121.   Los Angeles has suffered financial injuries as a direct result of JPMorgan's pattern or practice of reverse redlining and the resulting disproportionately high rate of foreclosure on JPMorgan loans to African-Americans and Latinos in minority neighborhoods in Los Angeles.  Los Angeles seeks redress for these injuries.  The City does not seek redress in this action for injuries resulting from foreclosures on mortgages originated by lenders other than JPMorgan.

122.   JPMorgan continues to engage in the discriminatory pattern or practice described herein with similar and continuing deleterious consequences to the City.

123.   The City seeks damages based on reduced property tax revenues based on (a) the decreased value of the foreclosed properties themselves, and (b) the decreased value of properties surrounding the foreclosed properties.  In addition, the City seeks damages based on municipal services that it still must provide to remedy blight and unsafe and dangerous conditions which exist at vacant properties that entered foreclosure as a result of JPMorgan's illegal lending practices.

### A.   Los Angeles has been Injured by a Reduction in Property Tax Revenues from Foreclosures Caused by Discriminatory Loans Issued by JPMorgan

124.   As stated in a September 2011 Report by the Alliance of Californians for Community Empowerment and the California Reinvestment Coalition, entitled *The Wall Street Wrecking Ball:  What Foreclosures are Costing Los Angeles Neighborhoods* ("Cost to Los Angeles Report"), "[w]hen a home falls into foreclosure, it affects the property value of the foreclosed home as well as the values of other homes in the neighborhood."  These decreased property values in turn reduce property tax revenues to the City.

125.   "As property values drop an estimated $78.8 billion, Los Angeles communities could lose as much as $481 million in property tax revenue" from the

decreased value of the foreclosed homes themselves and those in the surrounding neighborhoods.[31]

126.   To be clear, vacancies and short sales even prior to completion of foreclosure also result in diminished home values.  Indeed, "[i]n 12 states, including California, Florida, Arizona, New York and New Jersey, pre-foreclosure sales actually outnumbered REO sales."[32]  Such distressed sales reduce property values.[33]

**1.   The decreased value of the properties foreclosed by JPMorgan result in reduced property tax revenues.**

127.   The *Cost to Los Angeles* Report states that "[i]t is estimated that homes in foreclosure experience a 22% decline in value."[34]

128.   For example, "[t]hat means the impact of the 200,000 foreclosures estimated for the period 2008 through 2011 will be more than $26 billion in lost home value in communities across Los Angeles."[35]  A portion of this lost home value is attributable to homes foreclosed as a result of JPMorgan's discriminatory loan practices.

129.   The decreased property values of foreclosed homes in turn reduce property tax revenues to the City and constitute damages suffered by Los Angeles.

**2.   The decreased value of properties in the neighborhoods surrounding foreclosed properties results in reduced property tax revenues.**

130.   JPMorgan foreclosure properties and the problems associated with them likewise cause especially significant declines in surrounding property values because the neighborhoods become less desirable.  This in turn reduces the property tax revenues collected by Los Angeles.

---

[31] *Cost to Los Angeles* Report at 3.

[32] *See* http://www.realtytrac.com/content/news-and-opinion/short-sales-increasing-in-2012--short-sale-process----realtytrac-7204.

[33] *See* http://www.realtytrac.com/content/foreclosure-market-report/us-foreclosure-sales-and-short-sales-report-q1-2013-7732.

[34] *Id.*

[35] *Id.*

131.   Property tax losses suffered by Los Angeles as a result of JPMorgan's foreclosures are fully capable of empirical quantification.

132.   Routinely maintained property tax and other data allow for the precise calculation of the property tax revenues lost by the City as a direct result of particular JPMorgan foreclosures.  Using a well-established statistical regression technique that focuses on effects on neighboring properties, the City can isolate the lost property value attributable to JPMorgan foreclosures from losses attributable to other causes, such as neighborhood conditions.  This technique, known as hedonic regression, when applied to housing markets, isolates the factors that contribute to the value of a property by studying thousands of housing transactions.  Those factors include the size of a home, the number of bedrooms and bathrooms, whether the neighborhood is safe, whether neighboring properties are well-maintained, and more.  Hedonic analysis determines the contribution of each of these house and neighborhood characteristics to the value of a home.

133.   The number of foreclosures in a neighborhood is one of the neighborhood traits that hedonic analysis can examine.  Hedonic analysis allows for the calculation of the impact on a property's value of the first foreclosure in close proximity (*e.g.*, ⅛ or ¼ of a mile), the average impact of subsequent foreclosures, and the impact of the last foreclosure.

134.   Foreclosures attributable to JPMorgan in minority neighborhoods in Los Angeles can be analyzed through hedonic regression to calculate the resulting loss in the property values of nearby homes.  This loss can be distinguished from any loss attributable to non-JPMorgan foreclosures or other causes.  The loss in property value in minority neighborhoods in Los Angeles attributable to JPMorgan's unlawful acts and consequent foreclosures can be used to calculate the City's corresponding loss in property tax revenues.

135.   Various studies establish that hedonic regression can be used for this purpose.  A study published by the Fannie Mae Foundation, using Chicago as an example, determined that each foreclosure is responsible for an average decline of approximately 1.1% in the value of each single-family home within an eighth of a mile.[36]

136.   Other studies have focused on the impact of abandoned homes on surrounding property values.  A study in Philadelphia, for example, found that each home within 150 feet of an abandoned home declined in value by an average of $7,627; homes within 150 to 299 feet declined in value by $6,810; and homes within 300 to 449 feet declined in value by $3,542.[37]

137.   These studies highlight the foreseeability of tax related harm to the City as the result of foreclosures arising from discriminatory loans.

138.   And most recently, the *Cost to Los Angeles* Report stated, "[i]t is conservatively estimated that each foreclosed property will cause the value of neighboring homes within an eighth of a mile to drop 0.9%."  Thus, "[i]n Los Angeles, impacted homeowners could experience property devaluation of $53 billion."  This decreased property value of neighboring homes in turn reduces property tax revenues to the City.

139.   Application of such Hedonic regression methodology to data regularly maintained by Los Angeles can be used to quantify precisely the property tax injury to the City caused by JPMorgan's discriminatory lending practices and resulting foreclosures in minority neighborhoods.

---

[36] *See* Dan Immergluck & Geoff Smith, *The External Costs of Foreclosure: The Impact of Single-Family Mortgage Foreclosures on Property Values*, 17 HOUSING POLICY DEBATE 57 (2006) at 69.

[37] *See* Anne B. Shlay & Gordon Whitman, *Research for Democracy: Linking Community Organizing and Research to Leverage Blight Policy*, at 21 (2004).

**B.    Los Angeles Is Injured Because It Still Must Provide Costly Municipal Services for Properties in Minority Neighborhoods that Have Become Vacant as a Direct Result of Discriminatory Loans Originated or Purchased by JPMorgan**

140.   Vacant JPMorgan foreclosure properties cause direct costs to the City because the City is required to provide increased municipal services at these properties.  Even prior to completion of the foreclosure process, data shows that 20% of homes are vacated.[38]  These increased municipal services would not have been necessary if the properties were occupied.

141.   For example, the City's Police Department must send personnel and police vehicles to vacant JPMorgan foreclosure properties to respond to public health and safety threats that arise at these properties because the properties are vacant.  Because violent crime has been found to increase 2.33% for every 1% increase in foreclosures, among other services, LAPD must respond to calls reporting suspicious activity at vacant properties, perform ongoing investigations involving criminal activity, including gang activity, at vacant properties.

142.   Likewise, the Code Enforcement Bureau of the Los Angeles Building and Safety Department ("Building and Safety Department") must devote personnel time and out-of-pocket funds to inspect vacant properties and issue orders for violations of the municipal code to be fixed.  When the municipal code violations are not fixed, the Building and Safety Department is required to perform certain services, including, but not limited to, removing excess vegetation at vacant properties, hauling away trash and debris at vacant properties, boarding vacant property from casual entry, putting up fencing to secure vacant properties, putting up fencing to prevent access to swimming pools by young children at vacant properties, coordinating with the Los Angeles County Health Department to chemically treat the pools at vacant properties to prevent mosquitos from breeding, painting and removing graffiti at vacant properties,

---

[38] *See* http://www.realtytrac.com/content/foreclosure-market-report/owner-vacated-foreclosure-update-7771.

COMPLAINT FOR VIOLATION OF
THE FEDERAL FAIR HOUSING ACT
010346-11  691167 V1

condemning and demolishing vacant structures deemed an imminent hazard to public safety, and having vacant properties frequented by gangs declared a public nuisance and demolished on that basis.

143.   As stated by the *Cost to Los Angeles* Report, "[l]ocal government agencies have to spend money and staff time on blighted foreclosed properties, providing maintenance, inspections, trash removal, increased public safety calls, and other code enforcement services …. Responding to these needs is a gargantuan task that involves multiple agencies and multiple levels of local government."[39]

144.   Moreover, as discussed above, the Apgar-Duda report underscores the foreseeability of municipal costs as the result of foreclosures arising from discriminatory loans.

## VII.   SAMPLE FORECLOSURE PROPERTIES IN THE CITY OF LOS ANGELES

145.   Plaintiff has already identified two thousand five hundred and sixty-four (2,564) discriminatory loans issued by JPMorgan in Los Angeles between 2004-2011 that resulted in commencement of foreclosure proceedings.[40]   The City has already incurred, or will incur in the future, damages corresponding to each of these properties.   A sample of property addresses corresponding to these foreclosures is set forth below:

2814 Altura St., 90031

7411 S. Hoover St., 90044

3905 Wisconsin St., 90037

---

[39] *Id.* at 3.

[40] Plaintiff anticipates that it will be able to identify significantly more foreclosures resulting from the issuance of discriminatory loans during this time period with the benefit of discovery.  This conclusion derives from the fact that, because of certain reporting limitations, the publicly available mortgage loan databases utilized by Plaintiff are not as comprehensive as the mortgage loan databases maintained by and in the possession of an issuing bank.

COMPLAINT FOR VIOLATION OF
THE FEDERAL FAIR HOUSING ACT
010346-11 691167 V1

- 47 -

1451 E. 54th St. 90011

5107 Alhambra Ave., 90032

238 E. Century Blvd., 90003

4965 Westhaven St., 90016

15413 S. Orchard Ave., 90247

1217 Bay View Ave., 90744

2016 E. 112th St., 90059

## VIII.  STATUTE OF LIMITATIONS AND CONTINUING VIOLATIONS DOCTRINE

146.   As alleged herein, Defendant JPMorgan has engaged in a continuous pattern and practice of mortgage discrimination in Los Angeles since at least 2004 by imposing different terms or conditions on a discriminatory and legally prohibited basis.  In order to maximize profits at the expense of the City of Los Angeles and minority borrowers, JPMorgan adapted its unlawful discrimination to changing market conditions.  This unlawful pattern and practice conduct is continuing through the present and has not terminated.  Therefore, the operative statute of limitations governing actions brought pursuant to the Federal Fair Housing Act has not commenced to run.

### IX.    CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

**(Violation of the Federal Fair Housing Act, 42 U.S.C. §§ 3601, *et seq.*)**

147.   Plaintiff repeats and incorporates by reference all allegations contained in the preceding paragraphs as if fully set forth herein.

148.   The Fair Housing Act's stated purpose is to provide, "within constitutional limitations, for fair housing throughout the United States."

149.   In contravention of that purpose, JPMorgan's acts, policies, and practices as described constitute intentional lending discrimination on the basis of race. JPMorgan has intentionally targeted residents of predominantly African-American and Latino neighborhoods in Los Angeles for different treatment than residents of predominantly white neighborhoods in Los Angeles with respect to mortgage lending. JPMorgan has intentionally targeted residents of these neighborhoods for high-cost loans without regard to their credit qualifications and without regard to whether they qualify for more advantageous loans, including prime loans.  JPMorgan has intentionally targeted residents of these neighborhoods for increased interest rates, points, and fees, and for other disadvantageous loan terms including, but not limited to, adjustable rates, prepayment penalties, and balloon payments.  JPMorgan has intentionally targeted residents of these neighborhoods for unfair and deceptive lending practices in connection with marketing and underwriting mortgage loans.

150.   JPMorgan's acts, policies, and practices have had an adverse and disproportionate impact on African-Americans and Latinos and residents of predominantly African-American and Latino neighborhoods in Los Angeles as compared to similarly situated whites and residents of predominantly white neighborhoods in Los Angeles.  This adverse and disproportionate impact is the direct result of JPMorgan's policies of providing discretion to loan officers and others responsible for mortgage lending; failing to monitor this discretion to ensure that borrowers were being placed in loan products on a nondiscriminatory basis when JPMorgan had notice of widespread product placement disparities based on race and national origin; giving loan officers and others responsible for mortgage lending large financial incentives to issue loans to African-Americans and Latinos that are costlier than better loans for which they qualify; otherwise encouraging and directing loan officers and others responsible for mortgage lending to steer borrowers into high-cost loans or loans with adjustable rates, prepayment penalties, or balloon payments

without regard for whether they qualify for better loans; and setting interest rate caps. These policies have caused African-Americans and Latinos and residents of predominantly African-American and Latino neighborhoods in Los Angeles to receive mortgage loans from JPMorgan that have materially less favorable terms than mortgage loans given by JPMorgan to similarly situated whites and residents of predominantly white neighborhoods in Los Angeles, and that are materially more likely to result in foreclosure.

151.   JPMorgan's residential lending-related acts, policies, and practices constitute reverse redlining and violate the Fair Housing Act as:

(a)   Discrimination on the basis of race and national origin in making available, or in the terms and conditions of, residential real estate-related transactions, in violation of 42 U.S.C. § 3605(a); and

(b)   Discrimination on the basis of race and national origin in the terms, conditions, or privileges of sale of a dwelling, in violation of 42 U.S.C. § 3604(b).

152.   JPMorgan's policies or practices are not justified by business necessity or legitimate business interests.

153.   JPMorgan's policies and practices are continuing.

154.   The City is an "aggrieved person" as defined by 42 U.S.C. § 3602(i) and has suffered damages as a result of JPMorgan's conduct.

155.   The City's damages include lost tax revenues and the need to provide increased municipal services. The loss of tax revenues at specific foreclosure sites and at closely neighboring properties in predominantly minority neighborhoods of the City was a foreseeable consequence that was fairly traceable to JPMorgan's discriminatory lending. Likewise, the need to provide increased municipal services at blighted foreclosure sites in predominantly minority neighborhoods of the City was a foreseeable consequence that was fairly traceable to JPMorgan's discriminatory lending.

156.   JPMorgan's policies and practices, as described herein, have and has had the purpose and effect of discriminating on the basis of race or national origin.  These policies and practices were intentional, willful, or implemented with reckless disregard for the rights of African-American and Latino borrowers.

157.   The City has a substantial interest in preventing discriminatory lending that causes disproportionately minority home foreclosures within its boundaries, in preventing segregated areas where minority loans are more likely to foreclose, and in holding banks accountable for damages arising from that discriminatory lending. Accordingly, the City's interests in obtaining injunctive relief to prevent such discrimination and in remedying the blight and recovering the lost property taxes resulting from the disproportionately minority home foreclosures in Los Angeles are directly related to ensuring "fair housing throughout the United States."

## SECOND CLAIM FOR RELIEF

### (Common Law Claim For Restitution Based On California Law)

158.   Plaintiff repeats and incorporates by reference all allegations contained in the preceding paragraphs as if fully set forth herein.

159.   As a direct and proximate result of Defendants' predatory lending practices, Defendant has been enriched at Plaintiff's expense.  Defendants have failed to remit those wrongfully obtained benefits or reimburse the City for their costs improperly caused by Defendants, and retention of the benefits by Defendants would be unjust without payment.

160.   In addition, to its detriment the City has paid for the Defendants' externalities, or Defendants' costs of harm caused by its mortgage lending discrimination, in circumstances where Defendants are and have been aware of this obvious benefit and retention of such benefit would be unjust.

161.   Accordingly, the Court should order restitution, disgorgement of profits, and/or any other equitable relief deemed appropriate by the Court.

COMPLAINT FOR VIOLATION OF
THE FEDERAL FAIR HOUSING ACT
010346-11  691167 V1

- 51 -

1

**DEMAND FOR JURY TRIAL**

2    Pursuant to Fed. R. Civ. P. 38(b), the City demands a trial by jury on all issues

3 so triable.

4

**PRAYER FOR RELIEF**

5    WHEREFORE, the City respectfully prays that the Court grant it the following

6 relief:

7    A.  Enter a declaratory judgment that the foregoing acts, policies, and

8 practices of JPMorgan violate 42 U.S.C. §§ 3604 and 3605;

9    B.  Enter a permanent injunction enjoining JPMorgan and its directors,

10 officers, agents, and employees from continuing the discriminatory conduct described

11 herein, and directing JPMorgan and its directors, officers, agents, and employees to

12 take all affirmative steps necessary to remedy the effects of the discriminatory conduct

13 described herein, and to prevent additional instances of such conduct or similar

14 conduct from occurring in the future, pursuant to 42 U.S.C. § 3613(c)(1);

15    C.  Award compensatory damages to the City in an amount to be determined

16 by the jury that would fully compensate the City of Los Angeles for its injuries caused

17 by the conduct of JPMorgan alleged herein, pursuant to 42 U.S.C. § 3613(c)(1);

18    D.  Order JPMorgan to disgorge its wrongfully obtained profits and to

19 provide restitution to the City as alleged herein;

20    E.  Award punitive damages to the City in an amount to be determined by the

21 jury that would punish JPMorgan for the willful, wanton, and reckless conduct alleged

22 herein, and that would effectively deter similar conduct in the future, pursuant to 42

23 U.S.C. § 3613(c)(1);

24    F.  Award the City its reasonable attorneys' fees and costs, pursuant to 42

25 U.S.C. § 3613(c)(2);

26    G.  Require payment of pre-judgment interest on monetary damages; and

27    H.  Order such other relief as this Court deems just and equitable.

28

DATED: May 30, 2014

By  /s/ Michael Feuer
          Michael Feuer (SBN 111529)
City Attorney
James P. Clark (SBN 64780)
Chief Deputy City Attorney
CITY OF LOS ANGELES
200 N. Main Street, Room 800
Los Angeles, CA 90012
Phone: (213) 978-8100
Mike.feuer@lacity.org
James.p.clark@lacity.org

Steve W. Berman
HAGENS BERMAN SOBOL SHAPIRO LLP
1918 Eighth Avenue, Suite 3300
Seattle, WA 98101
Telephone: (206) 623-7292
steve@hbsslaw.com

Elaine T. Byszewski (SBN 222304)
Lee M. Gordon (SBN 174168)
HAGENS BERMAN SOBOL SHAPIRO LLP
301 North Lake Avenue, Suite 203
Pasadena, CA 91101
Telephone: (213) 330-7150
elaine@hbsslaw.com
lee@hbsslaw.com

Joel Liberson (SBN 164857)
Howard Liberson (SBN 183269)
TRIAL & APPELLATE RESOURCES, P.C.
400 Continental Blvd., 6th Floor
El Segundo, CA 90245
Telephone: (310) 426-2361
joel@taresources.com
howard@taresources.com

Robert Peck
CENTER FOR CONSTITUTIONAL
LITIGATION
777 6th Street NW, Suite 520
Washington, DC 20001
Telephone: (202) 944-2803
Robert.peck@cclfirm.com

Clifton Albright (SBN 100020)
ALBRIGHT YEE & SCHMIT
888 West 6th Street, Suite 1400
Los Angeles, CA 90017
Telephone: (213) 833-1700
clifton.albright@ayslaw.com

*Attorneys for Plaintiff the City of Los Angeles*